### THE TRANSFER NO. 18.

(Circuit Court of Appeals, Second Circuit. December 11, 1911.)

#### No. 97.

COLLISION (§ 95*)—STEAMERS MEETING—FAULT.

A collision at night off Hallett's Point, Hell Gate, between a tug entering the port and a car float alongside of a transfer tug passing up to Harlem river, *held* due solely to the fault of the transfer which initiated an agreement to pass starboard to starboard, but did not continue on her passing course as long as she should, while the tug went as close to the Long Island shore as she safely could.

[Ed. Note.—For other cases, see Collision, Cent. Dig. §§ 200–202; Dec. Dig. § 95.*]

Appeal from the District Court of the United States for the Southern District of New York.

Suit in admiralty for collision by Elmer A. Keeler as owner of the tug Gladwish against Transfer No. 18. Decree for libelant, and claimant appeals. Affirmed.

The memorandum opinion in District Court is as follows:

Libelant's tug Gladwish was coming light through Hell Gate and bound into the harbor at the same time claimant's tug Transfer No. 18, with a

---

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

car float on each side, was coming up the westerly channel of Blackwell's Island, bound into the Harlem River. The time was between 2 and 3 a. m. of a dark night, said to be slightly hazy, but evidently not sufficiently so to cause any obscuration of lights. The Transfer 18 blew a bend whistle announcing her intention of rounding Horn's Hook, and going into the Harlem. She was prevented from doing this by other vessels coming out, and her master therefore concluded to pass outside of Mill Rock (between that obstruction and Ward's Island), and thus get to his destination. The Gladwish blew a bend whistle at Negro Point. It was after each vessel had blown the above-mentioned bend signals that they saw each other. That each saw the other at the same time is not doubted, but the distance that the vessels were then apart is a point upon which the witnesses do not agree. According to the Gladwish, the Transfer was seen while no further upstream than the beacon at the upper end of Blackwell's Island, while the Transfer's captain places himself well beyond that aid to navigation.

This difference is not thought to be material, for it is plain that even the lesser distance was at least 700 yards; it being agreed that the Gladwish when seen was between Hallett's and Negro Points. The Transfer blew two whistles, which the Gladwish heard, and, not thinking that it was intended for her, did not answer. Immediately a second similar signal was blown, and to this the Gladwish replied with two whistles. During the time that these whistles were being given and answered the vessels had not approached more than about a length, and in my judgment, were upwards of 500 yards apart when the assenting two whistles were sounded.

At this time the Gladwish had the Transfer from three to four points on her port bow, while the Gladwish bore from the Transfer rather less than that on the starboard bow.

The flood tide was running at the rate of about four miles, and against it the Gladwish was making about five miles over the land. The Transfer, with the tide, had been running from 10 to 11 miles an hour. She had slowed her engines on giving the bend whistle, but she must have been making by the land at least eight or nine miles an hour when the exchange of signals was accomplished.

It is not denied that the Gladwish starboarded her wheel until she was within 100 feet or less of the Astoria shore; yet within a very short time after the signals were given she had a collision (at an angle of about five points) with the starboard side of the starboard float of the Transfer, about 25 feet from the after end of the float. This maneuver was initiated by the Transfer. If the two vessels are regarded as on crossing courses, then, under article 19, it was the duty of the Transfer to keep out of the way of the Gladwish; if the waters between the upper end of Blackwell's Island and Hallett's Point be regarded as a narrow channel, then the Transfer suggested and requested a departure from Article 25. If the navigation of such waters as those now under consideration be regarded as a case of special circumstances, then the Transfer gave a signal which plainly asked the Gladwish to pass her starboard to starboard or to go under her stern, approaching from the starboard side.

Undoubtedly the waters were narrow. The presence of a dredge in the neighborhood of Mill Rock reduced the channel between the dredge and the Long Island shore to approximately 600 feet; but it still remains true under any view of the case that the Transfer by swinging under a starboard helm so that the tide ultimately caught her flotilla broadside did occupy five-sixths of this narrow waterway and crowded the Gladwish as near to the Long Island shore as it was safe for any vessel to go. This, in my judgment, was the primary and principal fault causing this collision. Of these very waters, it has been said: "In such a location the initial fault which brings about a situation of peril is much more serious than it would be in waters where there is a better chance for escaping from such situation by subsequent maneuvers. When one such fault clearly established is found to have precipitated the peril, the court will give much weight to any reasonable excuse offered by one of the other vessels for not undertaking

some maneuver which might have avoided the catastrophe." The Transfer No. 9, 107 Fed. 534, 46 C. C. A. 452.

Against the Gladwish, it is asserted that she should either (1) have stayed behind Hallett's Point until the Transfer had gotten out of the way; or (2) that she should have gone nearer to the Astoria shore.

As to the first accusation against the Gladwish, I do not think the custom is proven by "any such preponderance of evidence * * * as will establish a custom changing the general rule." The Josphine B, 58 Fed. 816, 7 C. C. A. 498.

As to the second charge of fault, it is plain that the Gladwish had given the Transfer five-sixths of the channel, and she was fully justified in believing that that was enough; but, even if the error of not going 50 feet nearer Astoria than she did be not regarded as one in extremis, it is further proved that the swing of the Transfer and her tow under the combined influence of helm and tide would start gently and quickly increase in rapidity. So that I find no difficulty in believing that, while it is true that the Transfer began to starboard as soon as she sounded two whistles, it is also true that her swing when approaching the Gladwish was so rapid (and so much more rapid than it had been) that it gave the appearance of a sudden sheer, particularly when viewed through the darkness of night. To charge the Gladwish with fault under such circumstances is I think hypercriticism. A decree will therefore pass for the libelant, with costs.

Charles M. Sheafe, Jr. (James T. Kilbreth, of counsel), for appellant.

James J. Macklin (De Lagnel Berier, of counsel), for appellee.

Before LACOMBE, COXE, and NOYES, Circuit Judges.

PER CURIAM. The opinion of the District Judge will be found herewith. We concur in his reasoning and conclusion. There was no fault that we can see on the part of the Gladwish. The navigation —passing starboard to starboard—originated with Transfer No. 18. There was no impropriety in undertaking to pass in that way, but we think she could have continued on her passing course a little longer than she did, if the place of collision is that indicated on the map as the evidence shows it was. Had she done so, the collision would not have happened.

Decree affirmed, with interest and costs.